UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

KINROSS CHARTER TOWNSHIP,

          Plaintiff/Counter-Defendant,

v.                                     Case No. 2:06-cv-245

BRUCE OSBORN,                     HON. GORDON J. QUIST

          Defendant/Counter-Plaintiff/
          Third-Party Plaintiff,

v.

JASON OBERLE and SCOTT QUICK,
          Third-Party Defendants.
_____/

## OPINION

      Plaintiff/Counter-Defendant, Kinross Charter Township ("Kinross"), filed a claim against

Defendant/Counter-Plaintiff/Third-Party Plaintiff , Bruce Osborn ("Osborn"), in Chippewa County

Circuit Court seeking a declaratory judgment that Osborn voluntarily quit his job as a paramedic.

In response, Osborn filed a § 1983 counterclaim against Kinross and a § 1983 third-party complaint

against Jason Oberle ("Oberle") and Scott Quick ("Quick") alleging violations of his constitutional

rights.  Asserting federal jurisdiction under 28 U.S.C. § 1331, Kinross removed the case to this

Court.  The Court now has before it Kinross's Motion for Partial Summary Judgment, Kinross's

Motion to Strike affidavits and exhibits, Quick and Oberle's Motion for Summary Judgment, and

Kinross's Motion for Summary Judgment.  For the foregoing reasons, the Court will: (1) deny

Kinross's motion for partial summary judgment; (2) grant in part and deny in part Kinross's motion

to strike; (3) grant in part and deny in part Quick and Oberle's motion for summary judgment; and

(4) grant in part and deny in part Kinross's motion for summary judgment.

# I. Facts

Osborn, a veteran covered by Michigan's Veterans' Preference Act, M.C.L. § 35.401 *et. seq.*, was employed by Kinross as a paramedic. (Compl. at 2.)  Oberle was elected as Township Supervisor in 2004. (Bruce Osborn Aff. ¶ 1, Def.'s Resp. to Kinross Mot. Ex. 1.)  Oberle's opposing candidate in the election was Wendy Kennedy, Osborn's sister-in-law. (*Id*.) Within one year into Oberle's term, Osborn participated in an unsuccessful effort to recall Oberle. (*Id*. at ¶ 2.)  Prior to this (Spring of 2004), Oberle worked at the Bay Mills Resort and Casino where Osborn's wife, Wanda Osborn, is a supervisor. (Wanda Osborn Aff. ¶ 1, Def.'s Resp. to Kinross Mot. Ex. 2.) According to Wanda Osborn, she learned that Oberle had made an inappropriate sexual remark during the course of his employment. (*Id*. at ¶ 2.)   Wanda Osborn conducted an investigation concerning Oberle's behavior and submitted a report that led to a three-day suspension. (*Id*. at ¶ 3-4.)

In his role as Township Supervisor, Oberle has personnel-related duties, including the authority to give hire and fire recommendations.  (Hr'g Tr. at 87-88, Def.'s Resp. to Kinross Mot. Ex. 3.)  In response to allegations that Osborn was verbally abusive with other employees, Osborn entered into a "last chance contract" with Kinross on May 22, 2005. (Letter from Alan Moses to Bruce Osborn, Kinross's Br. Ex. A.)  This contract stipulated that any deviation from the policies and procedures of Kinross EMS or the township, or any show of temper or inappropriate behavior, would result in Osborn's immediate termination. (*Id*.)

On September 6, 2005, Osborn, along with several other paramedics, attended a Kinross Township meeting, where they read aloud a letter criticizing the current management of the EMS and requested that the current manager be relieved of his duties.  (Bruce Osborn aff. ¶ 3, Def.'s Resp. to Kinross Mot. Ex. 1.)  Osborn alleges that in response to the letter, Oberle recommended that the Township board terminate Osborn's employment. (*Id.* at ¶ 4) The Township board wrote Osborn a

2

"notice of counseling" letter informing him that his actions violated the chain of command regulations and instructing him to discontinue any future violations. (Notice of Counseling, Def.'s Resp. to Kinross Mot. Ex. 11.)  On Thanksgiving Day 2005, Oberle went to Bay Mills Casino and while speaking to an employee of the casino, called Osborn "a stupid ass." (Hr'g Tr. at 131-132, Def.'s Resp. to Kinross Mot. Ex. 3.)  Osborn also alleges that on November 28, 2005, Oberle swerved his vehicle towards himself and his wife while they were sitting in their own car at an intersection. (Bruce Osborn Aff. ¶ 5, Def.'s Resp. to Kinross Mot. Ex. 1.)  In response, Oberle states that, unaware of Osborn's presence, he cut a left-hand turn too close because he was on his cell phone and promptly corrected himself.  (Hr'g pp.126-127, Def.'s Resp. to Kinross Mot. Ex. 3.)

Quick was the Assistant EMS Manager.  In this role, he supervised Osborn on a daily basis. (Bruce Osborn Aff. ¶ 15, Def.'s Resp. to Kinross Mot. Ex. 1.)  On February 23, 2006, an orange EMS drug box was located in Osborn's car. (Police Incident Report at 1, Def.'s Resp. to Kinross Mot. Ex. 4.)  According to Quick, he received an anonymous phone call between 4:00 and 4:30 p.m. stating than an EMS employee named Bruce was selling drugs at a party. (*Id.* at 8.) While Quick was assisting with the ambulances, he saw Osborn's truck and decided to check it. (*Id.*)  Quick stated that David Kauer, another EMS employee, arrived on the scene at the same time.  (*Id.*)  Quick specifically stated that he did not approach Osborn's truck until Kauer was present.  Upon looking in the truck, Quick saw the orange drug box. (*Id.*)

The police investigation, however, revealed several discrepancies.  First, Kauer told the investigating officer that Quick did not approach him until after Quick had discovered the drug box in Osborn's truck.  (Supplemental Incident Report at 1, Def.'s Resp. to Kinross Mot. Ex. 5.)  Second, the investigating officer discovered that the phone records, which recorded all local, toll, and cell calls made to the EMS, did not disclose any phone calls between 2:10 and 5:05 p.m.  (*Id.* at 2.)

3

Finally, Quick told the investigating officer that there must be a problem because his wife called him during the same time period.  (*Id.*)  However, the officer discovered that this statement was not truthful because Quick's wife did not call until later in the evening. (*Id.*)  After the investigation, the prosecutor decided not to press charges against Osborn.

Without a hearing, Kinross suspended Osborn with pay on February 24, 2006.  (Letter from Alan Moses to Bruce Osborn, Third-Party Def.'s ("TPD") Br. Ex. F.)  On March 10, 2006, Alan Moses (Kinross Ambulance Supervisor) and Joe Paczowksi (EMS employee) attempted to deliver a letter from Kinross regarding its own investigation of the drug incident personally to Osborn at his home.  (Police Incident Report at 2, Def.'s Resp. to TPD's Mot. Ex. 10.)    According to Joe Paczkowski, Oberle instructed them to hand-deliver the letter in an attempt to get a negative reaction from Osborn.  (Paczkowski Deposition at 33-34, Def.'s Resp. to TPD's Mot. Ex. 7.)  As Moses approached Osborn's house, Osborn walked out of the house with a handgun pointed towards the ground and ordered Moses off his property.  (Police Incident Report at 2, Def.'s Resp. to TPD's Mot. Ex. 10.)  Moses stated that he was not threatened by Osborn.  (*Id.*)

On April 20, 2006, Kinross conducted a Veterans' Preference Act Hearing regarding the status of Osborn's employment relationship with Kinross.  (Hr'g Tr., Def.'s Resp. to Kinross Mot. Ex. 3.)   On June 19, 2006, Kinross  notified Osborn that it had voted to continue his employment and that he could return to work.  (Letter from Alan Moses to Bruce Osborn, Kinross's Br. Ex. 3.) Osborn did not return to work.  During this period, Osborn worked at Bay Mills Emergency Connection and at Helen Newberry Joy Hospital.  (Interrog. at ¶ 1, Kinross's Br. Ex. D.)

On July 25, 2006, Kinross filed the instant action in Chippewa Circuit Court seeking a declaratory judgment that Osborn voluntarily quit.  (Compl. ¶ 9.)  Osborn filed a § 1983 counterclaim against Kinross Township and a third-party complaint against Oberle and Quick

alleging violations of the First and Fourteenth Amendments of the United States Constitution. Following removal to this Court, Kinross filed a motion for partial summary judgment on the issue of whether Osborn voluntarily quit by failing to return to work after the removal of his suspension and, consequently, whether Kinross has any liability to Kinross beyond the date of its offer for continued employment.  Osborn opposed the motion and attached several affidavits.  Kinross subsequently filed a motion to strike the affidavits of Bruce Osborn, Wanda Osborn, and Russell Babcock (Osborn's attorney) as well as the police report and the prosecutor's review sheet.  Oberle and Quick then filed a motion for summary judgment arguing that they did not commit any constitutional violations.  Finally, Kinross filed a motion for summary judgment arguing that they did not commit any constitutional violations and/or that they were immune.

## II.   Discussion

### A.   Motion to Strike

In its motion to strike, Kinross asks this Court to strike the affidavits of Bruce Osborn, Wanda Osborn, and Russell Babcock for failing to comply with Federal Rule of Civil Procedure 56(e).  Rule 56(e) states that affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e).  Kinross first complains that the affidavits fail to show that the affiants are competent to testify to the matters stated.  All of the affiants stated that the information contained within the affidavits was based on personal knowledge, and the Court's review of the record confirms this statement.  Thus, as a general matter, the affiants are competent to testify on the matters contained within the affidavits.

More specifically, however, Kinross challenges certain statements within the affidavits as failing to set forth facts admissible in evidence.  First, Kinross moves to strike paragraphs

9,11,12,13, and 14 of Bruce Osborn's affidavit for being conclusory and based on inadmissable hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Unless a hearsay statement qualifies for a hearsay exception, it is inadmissible. Fed. R. Evid. 802.

First, Kinross challenges ¶ 9 of Bruce Osborn's affidavit stating "[t]hat on the date in which the drug box was allegedly found in my vehicle, Mr. Oberle was at the EMS station according to Kathy Gains who is an EMT specialist for the Township." However, Kathy Gains's statement is not hearsay because it is offered against a party (Kinross) and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D). Thus, paragraph nine is an admissible fact and will not be stricken.

Kinross next challenges Bruce Osborn's statement in paragraph 11 that "[e]ven though police investigators found Mr. Quick to be untruthful, nothing has been done by the Township to discipline Mr. Quick and Mr. Quick continues to serve as the Assistant Manager for the EMS to this very day." Although the fact that Mr. Quick continues to serve as the Assistant Manager is an admissible fact, the statement that police investigators found Mr. Quick to be untruthful is based on hearsay. In any event, because the fact that Mr. Quick continues to work for Kinross is not relevant to the pending motion for summary judgment, the Court will strike paragraph 11 from Bruce Osborn's affidavit.

Kinross also challenges Osborn's statement in paragraph 12 "[t]hat Mr. Quick's claim that he received the anonymous phone call regarding my alleged drug dealing as well as the fact that he allegedly discovered the drug box in my vehicle has been shared by Mr. Quick to my co-workers and other supervisors at the Kinross EMS." Again, Mr. Quick's statements to other parties are not

6

hearsay because they are an admission of a party-opponent under Fed. R. Evid. 801(d)(2)(D). Thus, this paragraph contains admissible evidence.

Kinross's next challenge is to Osborn's statement in paragraph 13 that:

I can no longer work for Kinross EMS so long as I have to work with Mr. Quick (which was a condition for the township offer of my reinstatement), since Mr. Quick's conduct has already resulted in a criminal investigation against me on one occasion and which could have resulted in a criminal prosecution but for the thorough investigation by the investigating police officer, and nothing has been done by the Township to ensure that future accusations of criminal activity will not be levied against me by Mr. Quick when I returned.

Kinross argues that this statement is nothing more than an inappropriate conclusion. However, Osborn's state of mind concerning his ability to continue employment under the supervision of Mr. Quick is relevant to the legal issues involved and is admissible. Therefore, the Court will not strike this paragraph.

Finally, Kinross objects to paragraph 14 of Osborn's affidavit, which states that:

I also cannot return to my former position in light of the fact that the Township has protected Mr. Quick by intervening and preventing the taking of Mr. Quick's polygraph test during the above-mentioned criminal investigation. The Township's intervention has only served to show that the Township has sided with Mr. Quick and has no interest in having the unlawful and criminal nature of Mr. Quick's conduct revealed, and there has been no indication that the Township will change its position.

Kinross argues that this statement is nothing more than a conclusion. For the reasons previously stated, Osborn's belief in his inability to resume employment as offered is relevant and admissible.

Defendants also protest any reference to Quick's refusal to take a polygraph examination. Similarly, the police report also mentions that Quick declined to take a polygraph examination and that Osborn took and passed an independent polygraph examination. In analyzing the admissibility of polygraph examinations, the Court conducts a two step analysis. First, the Court "must determine if the proffered evidence is relevant." *Wolfel v. Holbrook*, 823 F.2d 970, 972 (6th Cir. 1987). If the

evidence is relevant, the Court then assesses the evidence under Federal Rule of Evidence 403 and "must balance the probative value of the evidence against the hazard of unfair prejudice and/or confusion which could mislead the jury." *Id.* The United States Court of Appeals for the Sixth Circuit has provided several helpful guidelines to assist district courts in determining when the hazard of unfair prejudice outweighs the probative value of the evidence. First, "unilaterally obtained polygraph evidence is almost never admissible under Evidence Rule 403." *Conti v. Comm'r of Internal Revenue*, 39 F.3d 658, 663 (6th Cir. 1994). This is so because the "defendants were unaware of the test, and the results of the test presumably would not have been disclosed if they had been unfavorable." *Id.* at 662. Additionally, polygraph tests "are inherently unreliable." *United States v. Scarborough*, 43 F.3d 1021, 1026 (6th Cir. 1994).

The sole purpose of the polygraph evidence in the instant case is to either bolster Osborn's credibility (because he passed the exam) or to diminish Quick's credibility (because he declined to take the exam). Moreover, Osborn's examination was unilateral and without Defendants' knowledge. Therefore, the Court concludes that the prejudicial effect of the polygraph evidence (both Osborn's results and Quick's refusal to take the examination) outweighs its probative value. The Court will grant the motion to strike any evidence relating to the polygraph examinations.

In sum, the Court will strike paragraph 11 and the portion of paragraph 14 relating to polygraph examinations and leave the remainder of Bruce Osborn's affidavit intact.

Kinross also challenges Wanda Osborn's affidavit setting forth facts concerning Oberle's employment at Bay Mills Resort and Casino. Wanda Osborn states that as a supervisor, she "was made aware of the fact that Jason Oberle . . . had made an inappropriate sexual remark." (Wanda Osborn Aff. ¶ 2, Def.'s Reply Br. to Kinross Mot. Ex. 2.) Upon learning of this, she conducted an investigation that resulted in his three day suspension. (*Id.* at ¶¶ 3-4.) Kinross argues that this

information is based on hearsay and is irrelevant.  The only potential hearsay statement is that of the person who informed Wanda Osborn of Oberle's sexual remark.  However, this is not hearsay because it is not offered "to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  That is, the statement is not offered to prove that Oberle in fact made an inappropriate sexual remark, but rather to establish Wanda Osborn's state of mind in initiating the investigation.  Because Oberle's conduct towards Bruce Osborn, along with his accompanying intent, may become legally crucial, this incident is relevant to the extent it sheds light on Oberle's feelings towards Bruce Osborn.  Thus, at this stage, the Court will not strike the affidavit.

Next, Kinross takes issue with the affidavit of Russell Babcock, attorney for Bruce Osborn.  In his affidavit, Babcock states his intention to depose the witnesses identified in the police report.  Babcock further states his belief that these depositions will reveal the extreme nature of the hostility towards Osborn by Kinross management and the extent to which Quick participated in planting the drug box in Osborn's vehicle.  Kinross argues that this affidavit does not describe facts, but rather intentions.  While true, this affidavit qualifies under Fed. R. Civ. P. 56(f), which allows parties to oppose summary judgment motions by stating the reasons the party is unable to produce evidence by affidavit and its intent to do so through further discovery.  Because this affidavit qualifies under 56(f), the Court will not strike it.

Kinross also moves to strike the Prosecutor's Complaint Review Sheet offered by Bruce Osborn.  The sheet indicates that the prosecutor declined to charge Osborn for theft of the drug box and contains a handwritten note stating that there is no evidence that Osborn committed a crime and that the evidence indicates he was set up.  Kinross argues that the prosecutor's complaint review sheet is not properly authenticated, and therefore, should be stricken.  Fed. R. Evid. 901(a) provides

that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims."   Although not exclusive, one way of satisfying this requirement is by "[t]estimony that a matter is what it is claimed to be."  Since Osborn has failed to provide testimony, or any other evidence, that the complaint review sheet is what it purports to be, the evidence is not properly authenticated.  Therefore, the Court will strike the evidence from the record at this time.

Finally, Kinross moves to strike the Police Incident Report.  Kinross alleges that because the police report contains hearsay, it is inadmissible.  The admission of police reports into evidence is generally governed by Fed. R. Evid. 803(8).  The rule provides an exception to the hearsay rule for:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Further, the Supreme Court has also determined that Rule 803(8)(c) allows for admitted reports to contain conclusions and opinions, as well as fact.  *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170, 109 S.Ct. 439, 450 (1988).

Because the Advisory Committee notes assume admissibility in the first instance, "the burden is on the opponent to show that the report was inadmissible because its sources of information or other circumstances indicated a lack of trustworthiness." *Miller v. Field*, 35 F.3d 1088, 1090 (6th Cir. 1994) (quoting *Baker v. Elcona Homes Corp.*, 588 F.2d 551, 558 (6th Cir. 1978)).  In making this determination, the Court considers: "(1) the timeliness of the investigation; (2) the special skill or experience of the official; (3) whether a hearing was held on the level at which conducted; and (4) possible motivational problems." *Id.*

Based on the above factors, Kinross has not met its burden to show that the police report is inadmissible because it lacks trustworthiness. The investigation was conducted immediately after the incident and there is no evidence of any possible motivational problems or that the investigating officer lacked the necessary skill or experience. However, the inclusion within the reports of various witness statements may pose additional potential hearsay problems. Where witness statements are included in a police report, those statements themselves must satisfy the hearsay rule for that portion of the report – and the opinions derived from those statements – to be admissible. *Id.* at 1092.

The police report contains descriptions of the investigating officer's interviews (as well as accompanying witness statements) of David Kauer, Adam Raffaele, Bruce Osborn, Alan Moses, and Scott Quick. All of the witnesses were employees of Kinross EMS at the time that they gave their statements to the investigating officer. With the exception of Bruce Osborn's statement, none of the statements are hearsay because they are "offered against a party and [are] . . . statement[s] by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D). Thus, those statements, as incorporated into the police report, are admissible. Osborn's statements, however, do not qualify under this exception because he is a party to the litigation and is the one offering the evidence. Therefore, his statements are hearsay and do not qualify for a hearsay exception. For that reason, Osborn's statements will be stricken from the police report.

Additionally, the police report contains references to Osborn's polygraph examination and Quick's refusal to undergo a polygraph examination. For reasons previously enumerated, the Court will grant Kinross's motion to strike the portions of the police report relating to polygraph examinations. The remainder of the report, however, is left intact.

11

In conclusion, the Court will strike paragraph 11 of Bruce Osborn's affidavit, the Prosecutor Complaint Review Sheet, and the portion of the Police Incident Report containing statements made by Bruce Osborn to the investigating officer.  Also, the Court will strike any reference to polygraph examinations contained in, but not limited to, paragraph 14 of Osborn's affidavit and the police report.  The motion will be denied with regard to the remainder of the evidence.

### B.  Motions for Summary Judgment

#### 1.  Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56.  Material facts are facts which are defined by substantive law and are necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id.*  The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

#### 2.  Kinross's Motion for Partial Summary Judgment

First, the Court has before it Kinross's motion for partial summary judgment seeking a declaratory judgment that Bruce Osborn voluntarily quit his job and that Kinross therefore has no back-pay liability beyond the date of his refusal to return to work. Kinross argues in its motion for partial summary judgment that Osborn voluntarily quit his job by failing to return after Kinross removed his suspension and gave him an unconditional offer to return to work.  Osborn alleges,

however, that his refusal to return to work was not a voluntary resignation because it was the result of a constructive discharge. Osborn's offer to return to work would have required him to work under Quick's supervision. Osborn contends that such a work environment was sufficiently objectionable that it constituted a constructive discharge. In Michigan, "constructive discharge is a defense against the argument that no suit should lie in a specific case because the plaintiff left the job voluntarily." *Vagts v. Perry Drug Stores, Inc.*, 204 Mich. App. 481, 487, 516 N.W.2d 102, 104 (1994).

A constructive discharge occurs where "an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntarily resignation or, stated differently, when working conditions become so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign." *Id.* (internal quotations omitted.) As applied to the instant motion, the issue becomes whether there is a genuine issue of material fact that the work environment, as offered to Osborn, was so unpleasant that a reasonable person in Osborn's shoes would have felt compelled to decline the offer.

At a minimum, there is a genuine issue of material fact whether Quick was involved in planting the drug box in Osborn's vehicle. Osborn has produced evidence suggesting that Quick was not truthful regarding several important aspects of the criminal investigation: (1) whether he received an anonymous call setting forth Osborn's involvement in drug activity; (2) whether other EMS employees were present when he "discovered" the drug box in Osborn's vehicle; and (3) whether Quick lied when he told the investigating officer that his wife had also called during the time period when the records showed no incoming calls. From this, a reasonable jury could conclude that Quick was involved in, or knew about, placing the drug box in Osborn's vehicle.

Drawing all inferences in favor of the non-moving party, the inquiry becomes whether a constructive discharge occurs when an employee's supervisor frames an employee for engaging in

13

criminal conduct.  Put differently, does a supervisor framing an employee for criminal conduct create working conditions so intolerable that a reasonable person would have felt compelled to decline an offer to return to work under the control of the same supervisor?  The Court concludes that it would.

Assuming Quick planted the drug box in Osborn's vehicle, he exposed Osborn to severe criminal charges, placed his job in jeopardy, and simultaneously lowered his standing in the community.  If true, such activity is both shocking and egregious.  Although Osborn avoided criminal charges, a reasonable person in his shoes would not take the chance of resuming employment under the supervision of the same individual who caused so much consternation in the first place.  Taking the facts in the light most favorable to Osborn, he suffered severe consequences under Quick's supervision and felt, as would a reasonable person, that he should not take the risk of being exposed to similar conduct in the future.  Therefore, the offer to return to employment under Quick's supervision was an offer that he felt compelled to decline.  Because a reasonable person in Quick's shoes would feel likewise, he was constructively discharged.  Thus, the Court will deny Kinross's motion for partial summary judgment.

### 3.  Kinross, Quick, and Oberle's Motions for Summary Judgment

#### i.  Under Color of Law

Kinross, Quick, and Oberle, arguing that there is no genuine issue of material fact that they violated Osborn's constitutional rights, have moved for summary judgment on Osborn's counterclaims.  In filing his counterclaim and third-party complaint, Osborn relied on 42 U.S.C. § 1983.  "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or laws of the United States." *Waters v. City of Morristown,* 242 F.3d 353, 358 (6th Cir. 2001).

14

Osborn bases his complaint on five separate incidents: (1) Oberle attempting to hit Osborn with his car; (2) Oberle calling him a "stupid ass" at Bay Mill's Resort and Casino; (3) Oberle sending Moses and Paczkowski to hand-deliver a letter in an attempt to provoke a reaction from him; (4) someone planting the drug box in his car; and (5) his "notice of counseling" letter and suspension from Kinross EMS.  For these to be actionable under § 1983, each action must have been perpetrated by someone acting under color of law.  With regard to Kinross, Quick, or Oberle's involvement in delivering the letter, planting the drug box in Osborn's car, suspending Osborn with pay, and issuing the "notice of counseling" letter, those actions were under color of law.

However, Oberle was not acting under color of state law in attempting to hit Osborn with his car or calling Osborn a "stupid ass" at Bay Mills.  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250 (1998) (internal quotations and citations omitted).  While state employment is generally sufficient to render a defendant a state actor, "not every action undertaken by a person who happens to be a state actor is attributable to the state."  *Waters*, 242 F.3d at 359.  However, an official may act under color of law even if a private citizen could have taken the same action.  *Dean v. Byerley*, 354 F.3d 540, 552 (6th Cir. 2004).  Thus, "the controlling issue is whether [the defendant] possessed state authority and whether [the defendant] purported to act under that authority."  *Id.* at 553.  Therefore, "a defendant's private conduct, outside the course or scope of his duties and unaided by any indicia of actual or ostensible state authority is not conduct occurring under color of state law."  *Waters*, 242 F.3d at 359.

First, Oberle's conduct in attempting to hit Osborn with a car and calling Osborn a "stupid

ass" at Bay Mills Casino was outside the course and scope of his duties as Township Supervisor. There is no indication that Oberle and Osborn were working when these incident took place, nor were these incidents in any way related to their work responsibilities. However, as the Sixth Circuit made clear in *Dean*, the Court must also consider whether Oberle purported to act under his authority. Unlike *Dean*, however, Oberle did not threaten Osborn with state-sanctioned punishment nor refer to his authority in any way during the incidents in question. Therefore, assuming Oberle did attempt to hit Osborn with his vehicle and did refer to Osborn in vulgar terms at Bay Mills Casino, these actions were not taken under color of law. Thus, Osborn cannot base his § 1983 claim on either of these incidents. However, the remaining incidents were conducted under color of law, and the Court must determine whether these incidents violated Osborn's constitutional rights.

### ii. First Amendment Retaliation Claim

Osborn first alleges that Oberle, Quick, and Kinross retaliated against him in violation of the First Amendment. To succeed on a First Amendment retaliation claim, Osborn must demonstrate that: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a casual connection between elements one and two-that is, the adverse action was motivated at least in part by his protected conduct." *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006). Osborn alleges that the aforementioned incidents were in retaliation for his participation in the September township meeting where the letter critical of EMS management was read aloud. As part of their defense, Oberle, Quick, and Kinross argue that this letter was not protected speech because it did not deal with a matter of public concern.

In the public employment context, courts apply a two-pronged inquiry to determine whether speech is protected. First, the Court must determine whether the employee's speech "may be fairly

characterized as constituting speech on a matter of public concern." *Id.* (Internal citations omitted.) If so, then the Court applies a balancing test to determine if the employee's free speech interests outweigh the efficiency interests of the government as employer. *Id.* The Supreme Court recently refined this analysis in *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2006), in which it held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 1960. However, Osborn (and the other participants involved) did not make this speech pursuant to their official duties. Their job did not require them to observe, nor report, the complaints addressed in the September letter. Therefore, *Garcetti* does not bar Osborn's First Amendment claim. *See Pittman v. Cuyahoga Valley Career Ctr.*, 451 F.Supp.2d 905, 929 (N.D. Ohio 2006).

To proceed on the claim, Osborn must still show that the speech touched on a matter of public concern. Matters of public concern are those that can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690 (1983). However, when the speech concerns matters of only personal interest, the speech does not touch upon matters of public concern. *Id.* at 147. The Sixth Circuit has stated that "speech is of public concern if it involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004). "Such matters of public concern are to be contrasted with internal personnel disputes or complaints about an employer's performance." *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001). The difficult questions occur in situations similar to the present case: where the speech arises in the context of a personnel dispute but where the employee claims that some part of the speech also

17

touches upon matters of public concern. In those instances, the Court must examine: "the focus of the speech; the point of the speech in question; to what purpose the employee spoke; the intent of the speech; or the communicative purpose of the speaker." *Farhat*, 370 F.3d at 592.

The September letter read aloud and signed by Osborn (among others) referenced several complaints. While some were of public concern, many dealt with internal personnel disputes. The letter criticized the decreased reputation and morale of Kinross EMS, the lower level of care being provided to Kinross residents, threats to make all employees part-time or turn the EMS into a volunteer unit, EMS management falsely reporting the status of equipment and vehicles, and retaliation against an employee in violation of the First Amendment. These incidents touch upon matters of public concern. Namely, the reputation, morale, and level of service provided by Kinross EMS affects the level of service provided to Kinross residents and is information that residents need to make informed decisions about the operation of their government. Moreover, the criticism concerning EMS management's false reporting and First Amendment retaliation is a matter of public concern because "[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986).

However, some of the criticisms contained in the speech dealt with only internal personnel disputes. In the letter, Osborn complained of management's vindictive scheduling, delays in submitting vouchers, failing to cover shifts when necessary, and leaving town without adequately covering responsibilities. These complaints exemplify the class of daily workplace grievances that the First Amendment does not protect. Matters of scheduling, voucher reimbursement, and inadequate staffing are matters of personal interest only to the employees complaining of them.

Given that the speech contains matter of both public and private concern, it is necessary for the Court to base its decision on the focus, point, purpose, and intent of the speech. Because the bulk

of the speech criticizes matters of public concern, the Court finds that the speech as a whole touched upon matters of public concern.  The purpose of the speech was to highlight flaws in the way that Kinross EMS was being run in an effort to inform the public how those flaws were affecting the level of service available to Kinross residents.  Moreover, the letter sought to inform the public how certain management actions were violating the law.  Given this overarching purpose, it can fairly be said that Osborn's speech, as a whole, touched upon matters of public concern.

The next analysis in determining whether Osborn's speech is protected by the First Amendment is for the Court to apply a balancing test to determine if the employee's free speech interests outweigh the efficiency interests of the government as employer.  In doing so, the Court considers "whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Cockrel v. Shelby County Sch. Dist.,* 270 F.3d 1036, 1053 (6th Cir.2001).  Oberle, Quick, and Kinross allege that available procedures existed to complain of EMS management and by bypassing those procedures, Osborn disrupted the EMS department.  However, they have not provided any evidence of how Osborn's speech actually disrupted the operation or efficiency of the EMS department.  In contrast, Osborn's free speech interests remained at their zenith.  Therefore, the Court determines that Osborn's free speech interests in reading the letter outweighed Kinross's interest in efficiency as a government employer.  Thus, Osborn's speech is conduct protected by the First Amendment.

Osborn must also show that an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct and that the adverse action

was motivated, at least in part, by his protected conduct.  Because there remain three incidents upon which Osborn bases his claim, the Court will examine each in turn.

First, Osborn alleges that Oberle sent Moses and Paczkowski to deliver the investigation letter at his house in an attempt to provoke a negative reaction from Osborn that Oberle could then use against him.  Osborn claims that this act, in conjunction with others, was caused by his aforementioned protected speech.  To satisfy the adverse action prong, Osborn must show that the action "would deter a person of ordinary firmness from exercise of the right at stake." *Mattox v. City of Forest Park*, 183 F.3d 515, 521 (6th Cir. 1999).  As applied to the case at bar, the inquiry becomes whether an employer who, with the intent to provoke a negative reaction from an employee, sends people out to that employee's house to deliver a letter commits an act that would deter a person of ordinary firmness from exercising future protected conduct.  Concerned that "allowing constitutional redress for every minor harassment may serve to trivialize the First Amendment," *Id.* at 521, courts require that the incident have some serious effect.  Thus, while the deterrent effect need not be great, "certain threats or deprivations are so *de minimis* that they do not rise to the level of constitutional violations." *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999).

The Court finds that Oberle's actions in sending employees to deliver the letter to Osborn's house was not an adverse action.  Even assuming Oberle acted with the intent to provoke a negative reaction from Osborn, this incident was not sufficiently severe that it would deter a person of ordinary firmness from engaging in future protected conduct.  This action was inconsequential and lacked the potential for harmful consequences that usually characterize adverse actions in the First Amendment context.  Therefore, Osborn cannot base a First Amendment retaliation claim against any party on this incident.

Second, Osborn claims that someone planted the drug box in his car in retaliation for his protected conduct. If true, this would constitute an adverse action. As the Court previously noted, this action had the potential to inflict severe consequences on Osborn. In addition to his suspension, Osborn faced the potential for criminal charges and suffered damage to his reputation. The threat of facing unwarranted criminal charges would deter a person of ordinary firmness from engaging in future protected conduct. Moreover, the Court has previously determined that there is a genuine issue of material fact whether Quick was involved in this incident. However, there is no evidence that Oberle, or any other representative of Kinross, was involved in the drug box incident. Other than a statement that Oberle was at the EMS on the day the drug box was discovered, Osborn has not produced any evidence linking Oberle with this incident. Because Osborn cannot show that Oberle, or any other Kinross official, "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct," *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999), Osborn cannot base any claims against Oberle on the drug box incident.

Although there exist a genuine issue of material fact whether Quick took an adverse action against Osborn, Osborn must still show that this adverse action was motivated, at least in part, by his protected conduct. The Sixth Circuit has held that "the nonmoving party cannot rely on the mere fact than an adverse employment action followed speech that the employer would like to prevent." *Taylor v. Keith*, 338 F.3d 639, 646 (6th Cir. 2003) (internal citations and quotations omitted). Osborn must produce "sufficient evidence linking his speech to the employer's adverse decision so that a reasonable factfinder could conclude, by a preponderance of the evidence, that the speech, at least in part, motivated the decision." *Id.* Osborn has produced evidence sufficient to create a genuine issue of material fact that Quick – if he planted the drug box in Osborn's car – was

motivated by Osborn's protected conduct.  First, there is no plausible reason, other than retaliation, why Quick would plant evidence of criminal conduct in Osborn's car.  Second, Quick was hired by Kinross to deal with the "employment problems" created by Osborn's protected conduct.  (Quick Dep. at 6, Def.'s Resp. to TPD's Mot. Ex. 5.)  Taking the evidence in the light most favorable to Osborn, one could conclude that planting evidence of criminal conduct was Quick's method of remedying these "employment problems."  Therefore, there is a genuine issue of material fact whether Quick took an adverse action against Osborn and whether this action was motivated, at least in part, by Osborn's protected conduct.  Thus, the Court will deny Quick's motion for summary judgment with respect to Osborn's First Amendment retaliation claim premised on the drug box incident.

However, Kinross is not liable for Quick's potential First Amendment violation.  As a municipality, Kinross does not incur liability under the theory of *respondeat superior*.  *Miller*, 480 F.3d at 813.  "Rather, a municipality may be held liable under § 1983 only where its policy or custom causes the constitutional violation in question."  *Id.*  They may also be liable "for policies promulgated by the official vested with final policymaking authority for the municipality."  *Id.*  Osborn has not shown that any Kinross policy or custom caused the potential First Amendment violation.  Nor has he shown that Quick was vested with final policymaking authority for the municipality with respect to the incident at issue.  Thus, Kinross cannot be held liable for any First Amendment claims premised on the drug box incident.

Finally, Osborn also claims that Defendants violated his First Amendment rights by giving him the "notice of counseling" letter following his speech at the Township meeting and by suspending him with pay following the discovery of the drug box.  Because there is no evidence that Oberle was involved in either decision, Osborn cannot allege a First Amendment violation against

him based on either incident.  As to Quick, while there is no evidence that he was involved in the decision to suspend Osborn, he was the author of the "notice of counseling" letter.  Thus, Osborn can allege a First Amendment retaliation claim based on the "notice of counseling" letter against Kinross and Quick, and he can allege a claim based on his suspension against Kinross.

The Court finds that Osborn's suspension was an adverse action that would deter a reasonable person from engaging in future protected conduct.  *See Id.* at 521.  Thus, Osborn must show that the suspension was motivated, at least in part, by his protected conduct.  Osborn has failed to put forward any affirmative evidence to show that his suspension was motivated by his engaging in protected conduct five months earlier.  In fact, all the evidence shows that he was suspended because a drug box was found in his car.  Once Kinross determined that he was not responsible, they removed his suspension – thus indicating that it was the drug box that caused the suspension and not his protected conduct.  Therefore, because Osborn has failed to create a genuine issue of material fact that his suspension was motivated by his protected conduct, he cannot base a First Amendment retaliation claim on his suspension.

The Court also finds that the "notice of counseling" letter was an adverse action that would deter a reasonable person from engaging in protected conduct.  This letter constitutes a reprimand. Kinross (via Quick as the author) told Osborn that the "board is upset" with his actions and requested him to "cease actions as to involvement, instigation, or participation" with future similar conduct. Moreover, Kinross told Osborn that "[a] copy of this notice will be placed in your personnel file." Courts have repeatedly noted that reprimands constitute an adverse action in the First Amendment retaliation context.  *See Pierce v. Texas Dep't of Criminal Justice v. Pierce*, 37 F.3d 1146, 1150 (5th Cir. 1994); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 449 (4th Cir. 2004); *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2nd Cir. 2006)("adverse employment actions include discharge, refusal

23

to hire, refusal to promote, demotion, reduction in pay, and *reprimand*.")(internal quotations omitted and emphasis added).  Moreover, the Sixth Circuit has already held in the Title VII context that a reprimand need not be accompanied by "some other consequence, such as reduction in salary or a demotion."   *Jones v. Johanns*, 2007 WL 2694017, *5 (6th Cir. Sept. 14, 2007).  With this letter, Kinross sent a clear message to EMS employees: it would not condone participation in this type of speech.  By doing so, the letter "would deter a person of ordinary firmness from exercise of the right at stake."  *Mattox*, 183 F.3d at 521.  Additionally, there is no dispute that the letter dealt with, and thus was motivated by, Osborn's protected activity.  Kinross is not immune for this constitutional violation because the "notice of counseling" letter was the result of an official act by the Township Board that is "vested with final policymaking authority for the municipality."  *Miller v. Calhoun County*, 480 F.3d 803, 813 (6th Cir. 2005).  Therefore, Osborn has established a *prima facie* case of First Amendment retaliation against Kinross and Quick based on the "notice of counseling" letter, and the Court will deny summary judgment in this regard.

In sum, the Court will grant Oberle summary judgment on Osborn's First Amendment claims.  The Court will grant Quick summary judgment on the First Amendment claims premised on Osborn's suspension and the delivery of the letter, but deny Quick summary judgment for claims premised on the "notice of counseling" letter and the drug box.  The Court will grant Kinross summary judgment on the First Amendment claims premised on Osborn's suspension, the drug box, and the delivery of the letter, but deny Kinross summary judgment for claims based on the "notice of counseling" letter.

### iii.  Equal Protection Claim

Osborn next alleges that the facts demonstrate a violation of his Fourteenth Amendment Equal Protection rights.  "The Equal Protection Clause prohibits discrimination by government

24

which burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton County,* 430 F.3d 783, 788 (6th Cir. 2005). Conceding that the Defendants did not burden a fundamental right nor target a suspect class, Osborn bases his equal protection claim on the "class of one" theory established in *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073 (2000). To succeed, Osborn must "demonstrate that []he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Klimik v. Kent County Sheriff's Dep't*, 91 F.App'x 396, 400 (6th Cir. 2004). Osborn must show "that the relevant comparison employees are similarly situated in all relevant respects." *Young v. Mahoning County,* 418 F.Supp.2d 948, 960 (N.D. Ohio 2005). If Osborn can do so, he may demonstrate the lack of "a rational basis either by negativing every conceivable basis which might support the government action, or by showing that the challenged action was motivated by animus or ill-will." *TriHealth*, 430 F.3d at 788. The Court will examine each government action in turn.

First, Osborn claims that Oberle violated his right to equal protection by sending employees to deliver the investigation letter personally to Osborn at his house. However, this incident cannot support an equal protection claim. As a threshold matter, Osborn must show that he was treated differently than other employees similarly situated. Osborn alleges that Oberle, motivated by animus towards Osborn, sent Moses and Paczkowski to his house to provoke a negative reaction that could later be used against Osborn. However, Osborn has not created a genuine issue of material fact that Oberle, in doing so, treated him differently than others similarly situated. Osborn was on paid suspension. However, Osborn has failed to produce any evidence that other employees were also on paid suspension. Because Osborn's employment status at the relevant time was different from his co-workers, Osborn cannot establish that he was similarly situated to any other EMS employee.

25

*See Young*, 418 F.Supp.2d at 960 (finding that because plaintiffs were probationary employees, they could not establish that they were similarly situated to permanent employees). Absent a showing that there were other employees on paid suspension who did not have their correspondence personally delivered to them, Osborn cannot satisfy the first requirement of a "class of one" equal protection claim. Therefore, Osborn cannot base an equal protection claim against Oberle, Quick, or Kinross on this incident.

Next, Osborn alleges that because the drug box was planted in his car, he was treated differently in violation of the Equal Protection Clause. As with the First Amendment claim, Osborn has not created a genuine issue of material fact that Oberle was involved in this incident. Therefore, Osborn cannot allege that Oberle violated his right to equal protection based on this incident. However, there is a genuine issue of material fact whether Quick was involved in the incident. Therefore, it is necessary for the Court to determine whether Quick's involvement, if true, would violate Osborn's equal protection rights.

First, Osborn can establish that he was treated differently than other employees similarly situated. Since Osborn was not on suspension at this time, he was similarly situated to all the other EMS employees. Assuming Quick was involved in planting the drug box, Osborn can show that no other employee had a drug box planted in his or her car. Thus, in planting the drug box in Osborn's car, Quick treated Osborn differently than he did all the other similarly situated employees. Therefore, it is necessary for the Court to determine whether Quick's actions, if true, satisfy the rational basis standard. As previously stated, Osborn can do this by negating every conceivable basis which would support the action or by demonstrating that the action was motivated by animus or ill-will. *TriHealth*, 430 F.3d at 788. The Court can find no conceivable basis which would support Quick's involvement in planting the drug box in Osborn's car. Even though rational basis is the

least-demanding form of scrutiny for government actions, it is obvious that there is no rational basis for planting evidence of criminal conduct in an employee's car. If true, Quick's conduct is the type of irrational and arbitrary disparate treatment that the Equal Protection Clause protects. Therefore, the Court will deny summary judgment with respect to the equal protection claim against Quick. As with the First Amendment claim, Kinross is not liable for Quick's potential constitutional violation.

Finally, Osborn alleges that Kinross violated his equal protection rights by giving him the "notice of counseling" letter and suspending him with pay. Osborn's claims fail on both counts because Osborn is unable to establish that he was treated differently than other employees similarly situated. With regard to the "notice of counseling" letter, Osborn has not shown that other employees who also spoke out did not receive counseling letters. As to his suspension, Osborn was not similarly situated to other employees because he was the only employee whose car contained a drug box.

Moreover, even if he was similarly situated to the other employees, Kinross's actions satisfy the rational basis standard. Osborn has not produced any evidence that Kinross was motivated by animus or ill-will in suspending him or in issuing the "notice of counseling" letter. First, Kinross had a rational basis to issue the "notice of counseling" letter. Although the letter may have violated his First Amendment rights, discussed *supra*, Kinross still had a rational basis in issuing the reprimand to ensure compliance with its internal grievance procedures. Further, Kinross had a rational basis to suspend Osborn with pay while they investigated his liability with respect to the stolen box. At the time of Osborn's suspension, Kinross did not have any evidence suggesting that he may have been framed. In fact, once the police report cleared Osborn, it removed his suspension. Since Osborn has failed to negate every conceivable basis for Kinross's actions, those actions survive

rational basis review.  Therefore, Osborn cannot state a claim for an equal protection violation against Kinross.

In sum, the Court will grant Oberle and Kinross's motion for summary judgment on the equal protection claims.  With respect to Quick, the Court will grant his motion for claims premised on the delivery of the letter, the "notice of counseling" letter, and Osborn's suspension, but deny the motion with respect to his potential involvement in the drug box incident.

*iv.  Due Process Claim*

Osborn alleges that Oberle, Quick, and Kinross violated his rights to substantive and procedural due process.  To succeed on either claim, Osborn "must first show that [Oberle, Quick, or Kinross] deprived [him] of a constitutionally protected liberty or property interest." *Prater v. City of Burnside,* 289 F.3d 417, 431 (6th Cir. 2002).  Property interests "stem from an independent source, such as state law, and are not created by the Constitution itself." *Sharp v. Lindsey*, 285 F.3d 479, 487 (6th Cir. 2002).  As a veteran, Osborn was covered by Michigan's Veterans' Preference Act ("VPA"), M.C.L. § 35.401 *et. seq.*.  This act provides that "[n]o veteran . . . shall be removed or suspended . . . except for official misconduct, habitual, serious, or willful neglect . . . and such veteran shall not be removed, transferred, or suspended . . . except after a full hearing."  M.C.L. § 35.402.  The VPA "takes veterans out of an at-will employment regime and provides them with a property interest in their continued employment." *Young v. Twp. of Green Oak*, 471 F.3d 674, 684 (6th Cir. 2006).  Thus, Osborn has a property interest protected by both the substantive and procedural aspects of the Due Process Clause.[1]

---

[1]The parties also dispute whether Osborn had a protected liberty interest.  Although it appears doubtful because Osborn has not shown that any actions foreclosed the possibility of future employment as required by *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972), the Court need not reach the issue given its determination that Osborn had a protected property interest.

To succeed on his substantive due process claim, Osborn must show "conduct intended to injure in some way unjustifiable by any government interest and that is conscience-shocking in nature." *Mitchell v. McNeil*, 487 F.3d 374, 377 (6th Cir. 2007). Actions meet this high standard if they are an "egregious abuse of governmental power." *Shehee*, 199 F.3d at 301. Osborn's claims against Oberle and Kinross fail to meet this standard. Although Oberle may have had an improper motive in directing employees to deliver a letter at Osborn's house, this type of conduct is not the sort of egregious abuse of authority that the substantive component of the Due Process Clause is designed to protect. Moreover, Kinross's actions in suspending Osborn and issuing the "notice of counseling" letter, also fail to shock the Court's conscience. Kinross had a reasoned basis for its decisions. Further, given that the Sixth Circuit has held that even "a termination of public employment does not constitute a denial of substantive due process," *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1351 (6th Cir. 1992), Kinross's actions clearly do not meet this standard.

However, Osborn can proceed on his substantive due process claim against Quick. If Quick was involved in planting the drug box in Osborn's car, this would be the sort of egregious abuse of authority the Due Process Clause is designed to protect. In addition to jeopardizing Osborn's job, Quick placed Osborn's liberty interest at risk as well. By setting Osborn up for potential criminal liability and damaging Osborn's reputation in the community, Quick abused his authority in the most serious manner. If Quick intentionally framed Osborn, this would be conduct "intended to injure in some way unjustifiable by any government interest and that is conscience-shocking in nature." *Mitchell v. McNeil*, 487 F.3d at 377. Thus, Osborn may proceed with his substantive due process claim against Quick. As with the prior claims, Kinross is not liable for Quick's potential constitutional violation.

29

Lastly, Osborn alleges that Kinross violated his right to procedural due process by suspending him with pay without notice and a hearing. Since Osborn did have a property interest in his continued employment, "the question becomes what process is due." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493 (1985) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600 (1972)). Generally, due process requires that a deprivation of property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.* (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656 (1950)). In the public employment context "[t]he opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Id.* at 546. The parties do not dispute that Kinross suspended Osborn without a hearing. Therefore, Kinross deprived Osborn of his property interest in continued employment without due process. Kinross is not immune for this constitutional violation because Osborn's suspension was the result of an official act by the Township Board that is "vested with final policymaking authority for the municipality." *Miller*, 480 F.3d at 813. Thus, Osborn may proceed with his procedural due process claim against Kinross.

### III.   Conclusion

The Court will grant Kinross's motion to strike for paragraph eleven of Osborn's affidavit, the Prosecutor Complaint Review Sheet, the portion of the police report relating statements made by Osborn, and any references to polygraph examinations contained in, but not limited to, paragraph 14 of Osborn's affidavit and the police report. The remainder of the motion will be denied. Additionally, the Court will deny Kinross's motion for partial summary judgment seeking a declaratory judgment that Kinross voluntarily quit his job. The Court will grant Oberle's motion for summary judgment on all claims. With regard to Quick, the Court will grant his motion for

summary judgment for the First Amendment claims premised on the delivery of the letter and Osborn's suspension, but deny the motion with respect to Osborn's First Amendment claims based on the "notice of counseling" letter and the drug box incident. Additionally, the Court will deny Quick's motion for summary judgment on Osborn's equal protection and substantive due process claims.  For Kinross, the Court will grant its motion for summary judgment on the equal protection and substantive due process claims, but deny its motion with respect to Osborn's First Amendment and procedural due process claim.  Thus, Osborn may proceed on his First Amendment, equal protection, and substantive due process claims against Quick and his First Amendment and procedural due process claims against Kinross.


Dated:  December 3, 2007                                  _____/s/ Gordon J. Quist_____
                                                                                    GORDON J. QUIST
                                                                        UNITED STATES DISTRICT JUDGE